FILING FEE PAID

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | ) Chapter 7 (Involuntary) |
| | ) |
| | ) Case No. BK-S-11-15010-BAM* |
| TIMOTHY L. BLIXSETH, | ) |
| | ) *Matter pending before the USBC District of |
| Debtor. | ) Nevada before the Honorable Bruce A. Markell |

## MOTION TO QUASH SUBPOENAS

CrossHarbor Capital Partners LLC ("CrossHarbor"), Samuel T. Byrne ("Byrne"), Paul D. Moore ("Moore"), Duane Morris LLP ("Duane Morris") and John Toohey ("Toohey," and together with CrossHarbor, Byrne, Moore and Duane Morris, "Movants")[1], by their undersigned counsel, hereby move this Court for an Order, pursuant to Fed. R. Civ. P. 45, made applicable to these proceedings by Fed. R. Bankr. P. 9016, quashing the subpoenas (the "Subpoenas") served upon them by Timothy L. Blixseth ("Blixseth[2]"), and in support of this Motion aver as follows:

### I. INTRODUCTION

1. This matter arises out of an involuntary bankruptcy case (the "Involuntary Proceeding"), which the Montana Department of Revenue (the "MDOR"), the Idaho State Tax Commission (the "ISTC") and the California Franchise Tax Board (the "CFTB," and together with the MDOR and the ISTC, the "Petitioning Creditors") filed against Blixseth on April 5, 2011 in the United States Bankruptcy Court for the District of Nevada (the "Nevada Bankruptcy Court").

---

[1] Byrne is the Managing Partner of CrossHarbor. Moore and Duane Morris are counsel to CrossHarbor. Toohey is a consultant to CrossHarbor.

[2] Copies of the Subpoenas are attached hereto as Exhibits A (CrossHarbor), B (Byrne), C (Moore), D (Duane Morris), and E (Toohey). The Subpoenas seek both depositions and the production of documents. Pursuant to Fed. R. Civ. P. 45(c)(2)B, movants have served objections to the document requests, copies of which are attached hereto as Exhibits F (CrossHarbor), G (Byrne), H (Moore), I (Duane Morris) and J (Toohey).

2.  On May 27, 2011, the Nevada Bankruptcy Court dismissed the involuntary petition. A true and correct copy of the Order Dismissing Involuntary Petition Against Alleged Debtor Timothy L. Blixseth (the "Dismissal Order") is attached hereto as Exhibit K.

3.  Under the Dismissal Order, the Nevada Bankruptcy Court reserved jurisdiction to hear Blixseth's "Motions for Sanctions and for judgment under Bankruptcy Code section 303(i): and granted Blixseth leave to file '[r]enewed motions for Rule 9011 sanctions and Bankruptcy Code section 303(i)' judgment (sic)," so long as the motions were filed by June 3, 2011. Blixseth's current Motions for Sanctions Pursuant to Fed. R. Bankr. P. 9011(c) and 11 U.S.C. § 105(a) (the "Sanctions Motions") seek sanctions against the MDOR and certain of its representatives. True and correct copies of the Sanctions Motions are attached hereto as Exhibits L and M. The Subpoenas were issued in connection with a hearing on the Sanctions Motions, which the Nevada Bankruptcy Court has scheduled to commence on September 1, 2011.

4.  The issues raised in the Sanctions Motions are narrow and discrete. 11 U.S.C. § 303(i) states:

> (i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment –
>
> (1)  against the petitioners and in favor of the debtor for –
>
> (A)  costs; or
>
> (B)  a reasonable attorney's fee; or
>
> (2)  against any petitioner that filed the petition in bad faith, for –
>
> (A)  any damages proximately caused by such filing; or
>
> (B)  punitive damages.

In the context of a motion for sanctions under section 303(i), the only relevant issue is whether the petition was filed by the petitioners in bad faith. Similarly, in the context of a motion for sanctions under Rule 9011, the only relevant inquiry is whether there was a good faith basis for the factual and legal contentions set forth in the subject pleading (*i.e.*, the Involuntary Petition).

5.      Movants are strangers to the Involuntary Proceeding. None of the Movants is a Petitioning Creditor. None of the Movants has ever appeared in the Involuntary Proceeding. As set forth in further detail below, none of the Movants has ever communicated with any of the petitioning creditors, their counsel or any of their representatives, concerning Blixseth or the Involuntary Proceeding. In sum, none of the Movants possesses information that is relevant or that is likely to lead to the discovery of admissible evidence in connection with the Sanctions Motions. Further, Blixseth seeks documents and deposition testimony relating to a range of topics that are wholly unrelated to the Petitioning Creditors, the Involuntary Proceeding or the Sanctions Motions. In short, Blixseth has served unduly burdensome subpoenas in connection with a matter (*i.e.*, the Involuntary Proceeding) in which none of the Movants is a party and as to which none of the Movants has any relevant knowledge. Blixseth appears to be seeking information which he hopes will relate to various unrelated proceedings against CrossHarbor and others in which he already has conducted multiple day-long depositions of various CrossHarbor representatives and in which CrossHarbor has produced to him over 100,000 documents relating to the Yellowstone Club and virtually anyone associated with it and its Chapter 11 case (as further described below).

## II.     MOVANTS' EFFORTS TO RESOLVE THE ISSUES RAISED IN THIS MOTION.

6.      After service of the Subpoenas, Paul D. Moore, counsel to the Movants, telephoned Luis A. Ayon, Esquire, counsel to Timothy L. Blixseth, and left him a voice mail message

3

requesting that he call Mr. Moore to discuss the scope of the Subpoenas. Mr. Ayon has never returned by telephone call.

7. Subsequently, on Tuesday, June 7, 2011, Michael R. Lastowski, counsel to the Movants, exchanged e-mails with members of Mr. Ayon's law firm, as a result of which Mr. Lastowski had a telephone conversation with Mr. Ayon's colleague Aaron Craig. Mr. Craig advised that his law firm would no longer be representing Mr. Blixseth in connection with the Subpoenas. Instead, Mr. Blixseth would be represented by Christopher J. Conant.

8. On June 7, Mr. Lastowski telephoned Mr. Conant to discuss the Subpoenas. He advised Mr. Conant that none of the Movants had had communications with any of the Petitioning Creditors concerning Mr. Blixseth or the Involuntary Petition. He further pointed out the burdensomeness and overbreadth of the requested discovery. For example, paragraph 10 of the document request addressed to CrossHarbor (Exhibit A hereto) requests all documents relating to communications with Edra Blixseth, regardless of timeframe or subject matter.

9. Mr. Conant refused to limit the scope of any of the Subpoenas.

10. The Subpoenas represent a patently abusive use of Rule 45 and should therefore be quashed. The Court should also award Movants their costs and fees incurred in filing this Motion.

### III. BLIXSETH'S EXISTING DISPUTES WITH CROSSHARBOR AND THE YELLOWSTONE CLUB LIQUIDATING TRUST

11. Blixseth is involved in existing disputes with CrossHarbor and the Yellowstone Club Liquidating Trust (to whom Blixseth has also addressed a subpoena). None of these disputes is related to the Sanctions Motions. However, an understanding of these disputes, together with a review of the Subpoena, will reveal that the Subpoena has been served to harass CrossHarbor and its representatives.

A. **The Yellowstone Club Chapter 11 Proceeding and Blixseth's Objection to Confirmation.**

(a)  Yellowstone Club

12. Yellowstone Club is a private, world-class ski and golf community situated on over 13,500 acres of private land located in Big Sky, Montana near the northwest corner of the Yellowstone National Park. Members and guests enjoy world-class skiing with more than 2,200 acres of skiable terrain, more than 60 trails, 14 lifts, and a 2,700-foot vertical drop. Yellowstone Club offers other amenities as well, including the Warren Miller Lodge, a Tom Weiskopf-designed 18-hole golf course, world-class fly fishing, kids' facilities and other various amenities such as food and retail shops.

13. Yellowstone Club is a master-planned unit development that is contemplated to have 864 residential units at full build-out. Yellowstone Club is anticipated to have up to 864 Resident Members (who own property within Yellowstone Club) and up to an additional 150 National Members (who do not own real property with Yellowstone Club).

(b)  The Chapter 11 Proceeding and the Plan

14. Yellowstone Club and certain affiliates filed petitions for relief under chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the District of Montana (the "Montana Bankruptcy Court") at Case No. 08-61570-11. Ultimately, the Montana Bankruptcy Court confirmed Yellowstone Club's plan of reorganization (the "Plan"). At the time that the Bankruptcy Court approved the Debtors' Second Amended Disclosure Statement on April 7, 2009, the Debtors described the terms of the Second Amended Plan as follows:

> Among other things, the Plan provides that most of the Debtors' contractual obligations under [Yellowstone] Club membership agreements will be assumed and honored in accordance with the terms of those agreements and as provided for in the schedule of assumed obligations. Some members will have their existing contracts rejected, but are offered the election to enter into new

5

> uniform contracts in full satisfaction of any rejection claims. Development of the Project will continue. The Plan will fund payments to Convenience Class Unsecured Creditors, and if the present bidder for the Debtors' Membership Interests is the successful bidder, there will be provided a Trade Creditor Fund of up to $7,500,000 for payment of certain Allowed Claims of local trade and other unsecured creditors.
>
> The identity of the persons or entities entitled to receive payments from this Fund is discretionary with the Acquirer after consultation with the Unsecured Creditors' Committee and the Ad Hoc Members' Committee.
>
> The Plan is supported by the Creditors' Committee appointed in [Yellowstone] Development's Chapter 11 Case by the Office of the United States Trustee, the Ad Hoc Committee of Members, and the Current Equity Owners. The Committee, the Ad Hoc Committee and the Current Equity Owners urge all secured creditors, unsecured creditors, and [Yellowstone] Club members to support the Plan.
>
> . . . .
>
> The Plan provides for the reorganization of the Debtors and the continued development and operation of the Project through the issuance of 100% of the membership interest in the Reorganized YC, YD and Big Sky in exchange for the payment of at least $30 million in cash by the successful bidder plus payments on a secured promissory note with a face amount of $70 million payable by the Reorganized Debtor or the successor to the Debtor. . . . The successful bidder at the auction ("Acquirer") will then operate the Reorganized Debtors or acquire the assets of the Project and provide adequate assurance of future performance of the Assumed Obligations.

Second Amended Disclosure Statement at 5-6.

15. By the time the Bankruptcy Court confirmed the Plan, two significant developments had occurred that enabled the Debtors to proceed to confirmation with the consent of the Debtors' major creditor constituencies.

16. First, the Debtors successfully conducted an auction, as contemplated by the Second Amended Disclosure Statement. The results of this auction are summarized in the Bankruptcy Court's Memorandum of Decision relating to Confirmation of the Plan.

6

> The Third Amended Joint Plan of Reorganization reflects a manner of liquidating and reorganizing the Debtors' businesses, properties, and obligations that complies with and is acceptable under the Bankruptcy Code.
>
> Pursuant to the Third Amended Joint Plan of Reorganization, the Debtors' Project will be indirectly sold (by means of a Transfer of the reissued membership interests in the Debtors (other than YCC; the Debtors other than YCC, the "Project Debtors")) pursuant to the terms of the Definitive Agreement (as amended), a copy of which is attached to the Third Amended Joint Plan of Reorganization, the Required Plan Payments will be disbursed on the later of Effective Date or the date an order allowing any particular claim is entered, and the remaining property will be transferred and conveyed to the Liquidation Trust.
>
> The Acquirer of the Project Debtors' limited liability company membership interest is a Delaware limited liability company, New CH YMC Acquisition LLC [a CrossHarbor affiliate]. At the closing of the sale, New CH YMC Acquisition LLC shall pay the Debtors and the Trustee $35,000,000[3] to disburse in accordance with the Third Amended Joint Plan of Reorganization, provide Credit Suisse as agent for First Lien Lenders, a promissory note in the principal amount of $80,000,000 in the form contemplated by the Credit Agreement that is attached to the Yellowstone Club Settlement Term Sheet and grant Credit Suisse, as agent for the First Lien Lenders, a first lien mortgage and security agreement as contemplated by the Credit Agreement that is attached to the Yellowstone Club Settlement Term Sheet.
>
> At and after the Effective Date, the Debtors, Disbursing Agent, and Trustee shall make transfers and Distributions in accordance with the Third Amended Joint Plan of Reorganization.

17. The overall effect of the Plan was to restructure over $350 million in liabilities through the issuance of new membership interests in the Reorganized Debtors in exchange for the payment of $35.75 million in cash and the issuance of an $80 million promissory note (the "Note") payable to Credit Suisse, an agent for the major secured creditors in the case, secured by the Debtors' real property located outside Big Sky, Montana.

---

[3] This amount was later increased to $35.75 million.

7

18. The Reorganized Debtors were then to own and continue to operate the project with the existing memberships. All assets of the Debtors that were not related to the project were to be transferred to the Yellowstone Club Liquidation Trust for the benefit of all the unsecured creditors in the case. The Plan contemplated that a closing would occur on the Effective Date.

19. The Effective Date under the Plan occurred on July 17, 2009, and, pursuant to the Plan, all or substantially all of the transactions contemplated by the Plan were effected on and after the Effective Date.

20. On July 17, 2009, CrossHarbor and its affiliates completed the acquisition of 100% of the membership interests in the Reorganized Debtors (the "Acquisition"). At the closing of the Acquisition, CrossHarbor and its affiliates paid the $35.75 million cash portion of the purchase price and issued the Note to Credit Suisse and the Pre-petition Lenders in the amount of $80 million and the related mortgages and security interests on the assets of the Reorganized Debtors.

21. Blixseth appealed the entry of the Confirmation Order to the United States District Court for the District of Montana. He contended that the Plan was proposed in bad faith and objected to the scope of the Plan's releases and exculpation clauses. The District Court reversed and remanded. CrossHarbor and others appealed the District Court decision to the United States Court of Appeals for the Ninth Circuit, which determined that the appeals were not yet ripe. The case has been remanded to the Montana Bankruptcy Court, which has scheduled a status conference for July 11, 2011.

**B. The Yellowstone Club's Liquidating Trust's Adversary Proceeding Against Blixseth.**

22. Post-Confirmation, the Montana Bankruptcy Court tried Adversary Proceeding No. 09-00014, *Timothy L. Blixseth, Plaintiff vs. Marc S. Kirschner, Trustee of the Yellowstone*

8

*Club Liquidating Trust, Defendant*, and entered judgment against Blixseth in an amount in excess of $40 million. In the Adversary Proceeding, the Trustee of the Yellowstone Club Liquidating Trust alleged that Blixseth had breached his fiduciary duty to the Yellowstone Club by converting the proceeds of a loan from Credit Suisse to his own use and that the loan was a fraudulent conveyance. A copy of the Bankruptcy Court's Memorandum Decision is attached hereto as Exhibit N. A summary of that decision is attached hereto as Exhibit O. Blixseth appealed the entry of judgment and the appeal is pending before the United States District Court for the District of Montana. Notably, under the Plan, CrossHarbor and its affiliates are entitled to a priority distribution from the Yellowstone Club Liquidating Trust in the approximate amount of $10 million. This adverse interest provides a motive for Blixseth's harassment of CrossHarbor and its representatives.

### C.     Blixseth's civil action against CrossHarbor and Byrne in the United States District Court for the District of Massachusetts.

23.    On April 10, 2010, Blixseth filed a civil action against Byrne, CrossHarbor and others in the United States District Court for the District of California, which was subsequently transferred to the United States District Court for the District of Massachusetts at Civil Action No. 10-12182 (the "District Court Action"). In the District Court Action, Blixseth contends that CrossHarbor conspired with his former wife, Edra Blixseth, to defraud Blixseth and that the Chapter 11 filing of the Yellowstone Club was part of that conspiracy. Motions to dismiss are pending. Blixseth successfully delayed the hearing on the motions to dismiss by invoking the automatic stay that arose upon the filing of the Involuntary Petition.

### IV.    THE SUBPOENAS

24.    As set forth above, the Subpoenas were issued in connection with a scheduled hearing on Blixseth's motions for sanctions under 11 U.S.C. 301(i) and Fed. R. Bankr. P. 9011. In

this context, the only relevant inquiry is whether the involuntary petition was filed in bad faith by the petitioners and whether there was a legal and factual basis for the allegations of the Involuntary Petition.

25.     None of the Movants is a petitioning creditor, and none has appeared in the Involuntary Proceeding. Likewise, as set forth in their Declarations,[4] Byrne, Moore and Toohey have had no communications (oral or written) with any of the Petitioning Creditors, their counsel, or any of their representatives relating to Blixseth or the Involuntary Petition. As set forth in the Declarations of Byrne, Moore and Toohey respectively, no representatives of CrossHarbor or Duane Morris have had any communications with any of the Petitioning Creditors, their counsel or any of their representatives relating to Blixseth or the Involuntary Petition.

26.     Blixseth has already taken the deposition of a representative of the MDOR. Relevant excerpts of the transcript are attached hereto as Exhibit S. As set forth at pages 100 to 102 of the transcript, the MDOR representative was unaware of any communications between the MDOR and either (a) Duane Morris; or (b) CrossHarbor. The deponent could not even identify "Paul Moore."

27.     The Movants therefore have no information that is relevant or that is likely to lead to the discovery of admissible evidence in connection with the Sanctions Motions.

28.     Finally, Blixseth seeks information that is wholly unrelated to the Sanctions Motions, the production of which would impose an undue burden upon the Movants. Specifically, without setting forth any time period to which the requests pertain, and without limiting the subject matter to the Sanctions Motions, the Subpoenas request, *inter alia*: (A) any and all documents relating to communications with (i) MDOR, (ii) the State of Montana, (iii) Governor Brian

---

[4]     Copies of these declarations are attached hereto as Exhibits P, Q and R, respectively.

Schweitzer, (iv) Loren Bough, (v) John Toohey, (vi) Marc S. Kirschner, (vii) the Yellowstone Club Liquidating Trust, (viii) the Yellowstone Club Liquidating Trust Advisory Board, (ix) Credit Suisse, (x) Dan Bucks, or (xi) Franklin Hall regarding Timothy L. Blixseth; (B) any and all documents relating to communications with (i) MDOR, (ii) the State of Montana, or (iii) Governor Brian Schweitzer regarding Edra Blixseth; (C) any and all documents relating to communications with (i) MDOR, (ii) the State of Montana, or (iii) Governor Brian Schweitzer regarding the Yellowstone Club; and (D) any and all documents relating to communications with Edra Blixseth.

## V.    ARGUMENT

### A.    The subpoenas should be quashed on the grounds that they are unduly burdensome.

29.    CrossHarbor and its representatives are not parties to the Sanctions Motions. Under Rule 45, a party may not seek discovery of information from a non-party unless that information cannot be obtained from a party to the dispute. Further, a party seeking discovery from a non-party has an affirmative obligation to avoid imposing an undue burden on the non-party. *See Cash Today of Tex. v. Greenberg*, No. 02-MC-77-GMS, 2002 U.S. Dist. LEXIS 20694 at *13 (D. Del. Oct. 23, 2002) ("In determining if compliance with the subpoena would create an undue burden, the court should consider not only the potential burden to the producing party, but the necessity of the information for the party seeking production, and whether the information can be obtained from other, more convenient sources. In this undue burden inquiry, nonparties are afforded 'special protection.'") (citations omitted); *Cincinnati Ins. Co. v. Cochran*, 198 Fed. Appx. 831, 832 (11th Cir. 2006) (affirming lower court's decision to quash a subpoena where the party seeking discovery failed to comply with Fed. R. Civ. P. 45 and had not taken reasonable steps to avoid placing an undue burden on a non-party); *Nicholas v. Wyndham Intern., Inc.*, 373 F.3d 537, 543 (4th Cir. 2004) (upholding protective order under Fed R. Civ. P. 26(c),

finding that a non-party need not comply with discovery requests because the requesting party had already deposed the plaintiffs on the subject matter at issue, the plaintiffs remained under a continuing obligation to supplement their earlier document productions, and the non-party had no more information about the facts at issue than plaintiffs themselves had); *Fleet Business Credit v. Hill City Oil*, No. Civ. A. 03-MC-234, 2003 WL 840979 at *4 (E.D. La. Feb. 28, 2003) (sustaining a non-party's objection to discovery requests where party to the suit had already produced non-privileged documents responsive to the request and finding that "twin requests" constituted an abuse of discovery).[5]

30. Compliance with the Subpoenas would impose undue burden and expense upon CrossHarbor, Byrne, Moore, Duane Morris and Toohey. *Id.* at 547 ("When a subpoena should not have been issued, literally everything done in response to it constitutes undue burden or expense within the meaning of Civil Rule 45(c)(1)"). The Subpoenas should therefore be quashed because they impose undue burden and expense. Fed. R. Civ. P. 45(c)(3)(A)(iv).

31. Fed. R. Civ. P. 45(c)(1) states:

> A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and shall impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

32. Rule 45 is mandatory. The Court "shall" impose sanctions upon a party or attorney who fails to take reasonable steps to avoid imposing "undue burden or expense" in connection with the service of a subpoena. Movants therefore reserve their right to seek sanctions in connection

---

[5] Federal Rule of Civil Procedure 26(c), made applicable by Federal Rule of Bankruptcy Procedure 7026, also provides that the Court may, for good cause, issue an order protecting a party or person from undue burden and expense, including issuing an order forbidding discovery or disclosure. *See* Fed. R. Civ. P. 26(c); Fed. R. Bankr. P. 7026.

with the filing of this motion, in light of Blixseth's counsel's wholesale refusal to agree to limit the Subpoenas in any way.

### B. The subpoenas should be quashed on the grounds that they seek information not relevant to the Sanctions Motions.

33. As set forth above, the Movants have no information that is relevant to, or that is likely to lead to the discovery of admissible evidence in connection with, the Sanctions Motions.

34. The Movants have had no communications whatsoever with the Petitioning Creditors, their attorneys or any of their representatives regarding the filing of the Involuntary Petition. Discovery should not be permitted where the inquiry is based on the party's mere suspicion or speculation. *See Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1326 (Fed. Cir. 1990).

35. At best, the information sought in the Subpoenas may be relevant to other proceedings. When the purpose of a subpoena is to gather information for use in proceedings other than the one in which the subpoena was issued, the discovery sought by the subpoena is irrelevant and should be denied. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978); *see also In re Biovail Corp. Sec. Litig.*, No. 03-8917, 2007 U.S. Dist. LEXIS 91127, at *9-10 (S.D.N.Y. Dec. 4, 2007) (stating information sought for use in another proceeding is not relevant to the proceeding in which the subpoena was issued).

36. Based upon the foregoing, the Subpoenas should be quashed as they seek information that is not relevant to the Sanctions Motions.

### C. The Subpoenas should be quashed because they seek privileged information.

37. Rule 45(c)(3)(A)(iii) of the Federal Rules of Civil Procedure (the "Federal Rules") requires a court to quash a subpoena where the subpoena requires the disclosure of privileged or other protected matter, if no exception or waiver applies. Fed. R. Civ. P. 45(c)(3)(A)(iii).

38.     Where parties share a common legal interest but are represented by separate attorneys, the subject matter of a communication is privileged pursuant to the common interest privilege (an extension of the attorney-client privilege) where the communication is made in the course of furthering the ongoing, common interest. *Pampered Chef v. Alexanian*, 737 F.Supp.2d 958, 965-66 (N.D. Ill. 2010); *see also United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 (7th Cir. 2007).

39.     While the privilege originated in criminal proceedings, it applies equally to civil proceedings where parties have common legal interests in order to allow the attorney for one party to communicate with an attorney for another party without risking a waiver of the privilege. *See generally, In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362-67 (3d Cir. 2007).

40.     The Subpoenas seek documents relating to communications between Movants and the Yellowstone Club Liquidating Trust relating to Blixseth. In connection with Blixseth's appeal from the entry of the Confirmation Order, both CrossHarbor and the Yellowstone Club Liquidating Trust are appellees. Representatives of CrossHarbor also serve on the Yellowstone Club Liquidating Trust Advisory Board. The common interest privilege protects a broad scope of communications between these parties and their representatives. The subpoenaed parties share a common legal interest in the underlying bankruptcy case, which is the only context in which the subpoenaed parties would have had communications.

41.     The Subpoenas must be quashed pursuant to Rule 45(c)(3)(A)(iii) of the Federal Rules to the extent they seek disclosure of privileged communications and documents relating thereto.

**D.     The Subpoenas should be quashed to the extent they seek the deposition of opposing counsel.**

14

42. The subpoenas should also be quashed pursuant to Rule 45(c)(3)(A)(iii) of the Federal Rules to the extent that they seek the deposition of counsel, (*i.e.*, specifically, Moore).

43. While the Movants are strangers to the Nevada bankruptcy case, CrossHarbor and Blixseth are opposing parties in the Yellowstone Club bankruptcy proceeding and the Massachusetts District Court Motion. Generally speaking, the deposition of opposing counsel is disfavored and should be permitted only in very limited circumstances. *Nguyen v. Excel Corp.*, 197 F.3d 200, 209 (5th Cir. 1999).

44. This general rule is imposed because: (i) taking the deposition of opposing counsel disrupts the adversarial system; (ii) lowers the standards of the legal profession; (iii) adds to the already burdensome time and costs of litigation; and (iv) detracts from the quality of client representation. *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986). Accordingly, the deposition of opposing counsel should not proceed unless there is a strong showing of need and that the information sought cannot be obtained from other sources. *Nguyen*, 197 F.3d at 209; *see also Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 (5th Cir. 1999).

45. As articulated by the United States Court of Appeals for the Eighth Circuit, a party should be permitted to depose opposing counsel only if: (i) there are no other means to obtain the information sought; (ii) the information is relevant and not privileged; and (iii) the information is crucial to the preparation of the case. *Shelton*, 805 F.2d at 1327.

46. With respect to the first factor, Blixseth could subpoena any of the parties with which he believes the Movants had communications (*i.e.*, the Petitioning Creditors).

47. With respect to the second factor, again Blixseth can easily subpoena parties to the Nevada Involuntary Proceeding to obtain relevant information. Further, the requested information pertains to communications protected by the common interest privilege.

48.  Finally, with respect to the third factor, the vast majority (if not all) of the discovery requested are not crucial to Blixseth's pursuit to the Sanctions Motions. In fact, the requested information is not even relevant.

49.  For this reason, the Subpoena addressed to Moore should be quashed.

## VI. CONCLUSION

50. For the preceding reasons, the Subpoenas should be quashed pursuant to Fed. R. Civ. P. 45.

Dated: June 8, 2011

DUANE MORRIS LLP

/s/ Jeffrey D. Sternklar
Jeffrey D. Sternklar (B.B.O. No. 549561)
470 Atlantic Avenue, Suite 500
Boston, MA 02210
Telephone 857-488-4230
Facsimile 857-401-3057
PDMoore@duanemorris.com

- and -

Michael R. Lastowski (DE No. 3892)
DUANE MORRIS LLP
222 Delaware Avenue
Suite 1600
Wilmington, DE 19801
Telephone 302-657-4900
Facsimile 302-657-4942
mlastowski@duanemorris.com

Attorneys for CrossHarbor Capital Partners LLC, Samuel T. Byrne & John Toohey

IMAGE NOT AVAILABLE

SEE ORIGINAL FILED IN CLERK'S OFFICE